Fred Sherrill **PHARRIS**, et al.

v.

Byron **LOOPER**, individually and in his official capacity as Putnam County Assessor of Property, and Putnam County, Tennessee.

No. 2:97–0033.

United States District Court,
M.D. Tennessee,
Northeastern Division.

May 26, 1998.

Robert H. Watson, Jr. Knoxville, TN, Jerry Lee Burges, Cookeville, TN, for Looper.

Daniel Hurley Rader, III, Cookeville, TN, for Putnam County.

Joseph Edwards & Manuel Edwards, Knoxville, TN, for Plaintiffs.

## MEMORANDUM

NIXON, Chief Judge.

Pending before the Court is Defendant Putnam County, Tennessee's Motion for Summary Judgment (Doc. No. 18) and accompanying Memorandum (Doc. No. 19), to which the Plaintiff has filed a timely Response (Doc. No. 36). Furthermore, Defendant Byron Looper has filed a Motion to Dismiss him as a Defendant in both his individual and official capacities (Doc. No. 28) and accompanying Memorandum (Doc. No. 29). The Plaintiff has also filed a timely Response to this Motion (Doc. No. 43), to which the Defendant Byron Looper has Replied (Doc. No. 47). As the Court is of the opinion that oral argument is not necessary to illuminate the issues presented by these Motions, the Motion for Oral Argument submitted by Defendant Putnam County (Doc. No. 46) is DENIED. For the reasons expressed below, the Court hereby GRANTS Defendant Looper's Motion in part and DENIES it in part, and GRANTS in part and DENIES in part Defendant Putnam County's Motion. Accordingly, Plaintiffs Pharris, Roberts, Butler, and Huddleston's claims against all Defendants are DISMISSED. Furthermore, the Court GRANTS JUDGMENT in favor of Plaintiff Barbara Bandy with respect to her claims against all Defendants. The Court further ORDERS that this action be REFERRED to the Magistrate Judge to conduct a settlement conference, pursuant to Local Rule 20(d). The parties are DIRECTED to notify the Court within ten (10) days if they fail to reach settlement, at which time the Court will schedule a hearing to determine the amount of damages that should be awarded to Plaintiff Bandy.

## I. BACKGROUND

The present action is brought by several former employees of the Property Assessor's Office of Putnam County, Tennessee. The Plaintiffs allege that they were discharged from their positions by Byron Looper, the current Assessor of Property, based on political considerations, depriving them of their civil rights in violation of 42 U.S.C. § 1983. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343.

The facts which gave rise to this action have been only sparsely detailed by the parties. It appears that in 1996, the Plaintiffs were employed by the Assessor of Property as Deputy Assessors, with the exception of Plaintiff Barbara Bandy, who was employed as a field technician. (Compl. ¶¶ 1–5.) The Assessor of Property at the time was Bill Rippetoe, a Democrat. (*Id.* ¶ 10.) The year 1996 was an election year, and Rippetoe was challenged for his office by Republican Byron Looper. The Plaintiffs supported Rippetoe in his election campaign by putting up signs, passing out cards, holding benefit rallies, soliciting door-to-door, and wearing Rippetoe shirts, buttons and caps. (*Id.* ¶ 11.) Looper successfully ousted Rippetoe from his office, and upon doing so, replaced the Plaintiffs with allegedly less qualified political supporters. (Id. ¶¶ 13 & 16.)

## II. LEGAL ANALYSIS

### A. *Standard of Review*

The Court has before it both a Motion to Dismiss and a Motion for Summary Judgment by the Defendants. Since this Court will be considering materials outside of the pleadings in reaching its decision, it will treat both filings as motions for summary judgment. *United Bhd. of Carpenters and Joiners of America, Dresden Local No. 267 v. Ohio Carpenters Health and Welfare Fund,* 926 F.2d 550, 558 (6th Cir.1991). Rule 56(c) of the Federal Rules of Civil Procedure provides in part that summary judgment is proper if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, the non-movant may not rely solely on conclusory allegations, but rather must come forward with affirmative evidence which establishes its claims and raises an issue of genuine material fact. *Id.* at 324, 106 S.Ct. 2548. The court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *First Amendment Claims*

The issue of when it is appropriate for a public employer to fire employees because of political ideology was addressed by the Supreme Court in a trilogy of cases, *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

In *Elrod,* a plurality of the Court disapproved of a sheriff's practice of replacing non-civil service employees with members of his own political party. The Court determined that "patronage dismissals severely restrict political beliefs and association," *Elrod,* 427 U.S. at 372, 96 S.Ct. 2673, and thus "clearly infringe[ ] on First Amendment interests." *Id.* at 360, 96 S.Ct. 2673. Accordingly, the Court determined that patronage dismissals must be scrutinized strictly, and must be the least restrictive means of achieving government efficiency and effectiveness. *Id.* at 372. The Court further concluded that the proper balancing of First Amendment interests with the interests of government officials would be achieved by "limiting patronage dismissals to policymaking positions." *Id.* at 372. Justice Stewart's often-cited concurrence further refined the Court's

holding as prohibiting the discharge of a "nonpolicymaking, nonconfidential government employee" solely on the basis of his or her political beliefs. *Id.* at 375.

The Supreme Court's decision in *Branti* related to the political discharge of a public defender. The Court there determined that in determining whether a political discharge is appropriate, it is helpful to consider whether a position is "policymaking" or "confidential," but that the ultimate inquiry is whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. 1287. Finally, in *Rutan,* the Court concluded that these protections extended to the promotion, transfer, and recall after a layoff of low-level public employees. *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729.

The Sixth Circuit has interpreted the Court's pronouncements in the above three cases as requiring the court to examine the "position ... itself, rather than the position as performed [by the employee]." *Williams v. City of River Rouge,* 909 F.2d 151, 154 (6th Cir.1990); *accord Rice v. Ohio Dept. of Transp.,* 14 F.3d 1133, 1140 (6th Cir.1994), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2678, 129 L.Ed.2d 812 (1994). In other words, the court "must examine the inherent duties of that position and the duties that the new holder of that position will perform." *Faughender v. City of North Olmsted,* 927 F.2d 909, 913 (6th Cir.1991).

In *McCloud v. Testa,* 97 F.3d 1536 (6th Cir.1996), the Sixth Circuit outlined several categories of jobs for which political patronage may be a permissible requisite:

Category One: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

Category Two: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary

authority commonly held by category one positions in other jurisdictions;

Category Three: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions, or confidential advisors; [and]

Category Four: positions that are a part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*Id.* at 1557 (footnotes omitted). The Court gave the following examples of positions that would fall within the categories enumerated above: Category One includes a secretary of state, Category Two includes the deputy of a secretary of state, Category Three includes a judge's law clerk or secretary, and Category Four would encompass a position on a committee which requires that its members be of different political parties. *Id.* at 1557–58.

In the Sixth Circuit, the analysis of whether conditioning employment on political affiliation is a question of law. *Mumford v. Basinski,* 105 F.3d 264, 271 (6th Cir.1997). The court in *Mumford* acknowledged that the characterization of the specific duties of a public employee are fact-driven, however, the question of whether the nature of the position is political is one of law. *Id.* Sixth Circuit courts have held as a matter of law, for example, that a city attorney, *Williams,* 909 F.2d at 155–56, and a mayor's secretary, *Faughender,* 927 F.2d at 916, may be subject to discharge for political reasons.

The *McCloud* court further noted that "[i]n connection with using these categories ... any ambiguity about whether a position falls into any of them ... is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law ...." *Id.* at 1557. This comports with the Sixth Circuit's prior pronouncement in *Rice, supra,* that state legislatures have the ability to remove offices from the political sphere by including them

in a civil service system. "[T]he legislature's decision as to whether a particular job should be classified as political or nonpolitical is at least entitled ... to 'some deference.'" *Rice*, 14 F.3d at 1143 (quoting *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 246 (1st Cir.1986) (*en banc* )).

■ The protections of *Elrod* and *Branti* are only triggered if the public employee was discharged on the basis of political considerations. *Jones v. Dodson*, 727 F.2d 1329, 1335 (4th Cir.1984). The burden is on the plaintiff to show that political considerations were the motivating factor in the decision to terminate his employment. *Boger v. Wayne County*, 950 F.2d 316, 322 (6th Cir.1991). Once the plaintiff has established this, the burden shifts to the defendant to show that there were non-political reasons that justified the discharge. *Id.*

■ The Court finds that as a matter of law, the Plaintiffs have shown that they were discharged for political reasons. Looper admits in his Answer to the Complaint that he declined to reappoint the Plaintiffs to their positions once he was elected into office,[1] and that at all times the Plaintiffs were competent employees. (Ans. ¶¶ 13–14.) Thus, the Plaintiffs have proved their *prima facie* case. Looper does not come forth with any legitimate, non-political reason for his decision not to reappoint the Plaintiffs, and consequently, he has not met his burden of rebuttal.

The next question to be resolved is whether under *Elrod* and *Branti*, Looper violated the Plaintiffs' First Amendment rights by firing them on the basis of political patronage. The Court must thus determine whether the positions of deputy assessor of property and field technician may be properly conditioned on political alignment.

### 1. Deputy Assessor of Property

■ As a preliminary matter, the Court notes that in general, a legislative body's decision to include a government position in the civil service, and thus to shield it from political maneuvering, is entitled to some deference. *Rice*, 14 F.3d at 1143. However, Putnam County does not have a civil service system in place for any county employee. Thus, to conclude that the position of deputy assessor is political from the fact that it is not a civil service position would be tantamount to concluding that none of the Putnam County employees are entitled to protection from political patronage, even positions that clearly do not fall within the *Branti* exception. Accordingly, the Court will not assume from this fact that the Plaintiffs' discharge was permissible.

■ As discussed above, in order to determine whether political patronage is a permissible condition of employment, the court must look to the inherent duties of the job, and not to the tasks as performed by a particular individual. *Faughender*, 927 F.2d at 913; *accord Rice*, 14 F.3d at 1140. The position of deputy assessor of property is established by statute:

> In order to assure that each county assessor of property shall have a minimum staff to assist the county assessor in carrying out the duties and responsibilities required by law, the assessor is authorized to appoint at least one (1) deputy assessor for each four thousand five hundred (4,500) parcels of property .... Each deputy assessor shall have *the same power, duties and liability of the assessor of property with respect to the appraisal, classification, and assessment of property.*

Tenn.Code Ann. § 67–1–506 (Michie 1994). (Emphasis added.) Furthermore, the deputy assessors are empowered to compel the production of evidence necessary in the assessment of property, including "administer[ing] oaths and compel[ling] any witness to appear and to answer oral or written questions," to

---

1. The Supreme Court has made it clear that the limitations on political patronage are not limited to the decision to discharge an individual, but rather extend to such actions as recalling an employee. *Rutan*, 497 U.S. at 75, 110 S.Ct. 2729. Thus, Looper's decision not to reappoint the Plaintiffs would be considered an adverse employment decision subject to First Amendment

limitations. *See, also, Faughender*, 927 F.2d at 913 ("[A] failure to rehire is treated no differently than a firing under *Elrod* and *Branti*."); *Christian v. Belcher*, 888 F.2d 410, 416 (6th Cir.1989) (holding that "automatic termination from otherwise continuous government employment" is considered to be a "constructive discharge" for purposes of the First Amendment).

the same extent as the assessor of property. Tenn.Code Ann. § 67–5–303. The Defendants assert that since the deputy assessor is given the same powers, duties, and liabilities of the assessor in evaluating property, the position of deputy assessor clearly falls into either Category Two or Three of the *McCloud* test. The Court agrees that this would be true if the "appraisal, classification, and assessment of property," Tenn.Code Ann. § 67–1–506, are areas of "discretionary" or "policymaking" authority exercised by the assessor of property. *See McCloud,* 97 F.3d at 1557. If this is indeed the case, then assisting the assessor of property in performing these tasks would render the deputy assessors either persons to whom a "significant portion of the total discretionary authority" is delegated, or confidential advisors of the assessor of property. *Id.*

The assessor of property is charged with "equaliz[ing] the assessment of all property subject to taxation as provided by law." Tenn.Code Ann. § 67–1–501. The function of assessment, as defined by statute, includes evaluating: (1) all property held by persons claiming title to the property; (2) the property held by executors and administrators in the county, district or ward in which the decedent resided at the time of death; (3) personal property held by trustees and guardians; and (4) the property of all street railroad, gas, electric light companies and other utilities companies. Tenn.Code Ann. § 67–5–502. In an affidavit provided to the Court, the former Assessor of Property, Bill Rippetoe, elaborates that "the duty of the assessor of property [is] to prepare a list of the assessed value of all properties within his jurisdiction under the guidelines of the assessment manuals issued by the state division of property assessment and approved by the state board of equalization. This information is then used to assist the county commission in establishing the property rate." (Rippetoe Aff. ¶ 2.) From this de-

scription it appears that the "appraisal, classification, and assessment of property," all duties that the deputy assessors by law are capable of performing, are at the core of the discretionary and policymaking duties relegated to the assessor of property.[2] Thus, the Court concludes that "party affiliation is an appropriate requirement for the effective performance" of the deputy assessor position. *Hall v. Tollett,* 128 F.3d 418, 423 (6th Cir. 1997) (quoting *Branti,* 445 U.S. at 518, 100 S.Ct. 1287).

Furthermore, it is relevant that the assessor of property is "liable for any malfeasance, misfeasance, or nonfeasance of the assessor's deputy." Tenn.Code Ann. § 67–1–506(c). If an assessor is to be held responsible for the on-duty actions of his or her deputies, where the deputies have equivalent powers with respect to the evaluation of property, an assessor might be legitimately concerned that he or she share the same political views as his or her deputies. In *Terry v. Cook,* 866 F.2d 373 (11th Cir.1989), for example, the Eleventh Circuit held that the position of deputy sheriff in Alabama can be conditioned on political patronage, given that under Alabama law, (1) "[a]ny transaction within the scope of the sheriff's duties may be acted upon by his deputy;" (2) "the deputy sheriff is the alter ego of the sheriff;" and (3) "the sheriff is civilly liable for actions committed by a deputy done in the performance of his duty." *Id.* at 377. As in *Terry,* the Court concludes that the position of deputy assessor requires a "degree of closeness and cooperation" such that the assessor of property should have "absolute authority over their appointment and/or retention." *Id.*

The Plaintiffs have submitted numerous affidavits wherein they detail the duties that are actually delegated to deputy assessors, and characterize these duties as being ministerial. (Rippetoe Aff. ¶ 8.) For example, Bill Rippetoe asserts that during his tenure,

---

**2.** It is also significant that the assessor's task of valuing property is included in the oath that an assessor of property is bound to take by Tennessee law before taking office. Specifically, the assessor is required to affirm that he or she will "appraise, classify, and assess all taxable property of the county of _____ according to the Constitution of Tennessee and the laws of the state;

that [he or she] will truly report all persons who fail or refuse to list their taxable property or who have to my knowledge returned a fraudulent list; and ... will faithfully, impartially and honestly discharge [his or her] duties as assessor or property according to the law, to the best of [his or her] knowledge and ability, without fear, favor or affection ...." Tenn.Code Ann. § 67–1–507.

"[t]he plaintiffs were all 'front-line' workers whose responsibilities were to perform the daily dirty work.... [I]t did not involve planning strategy, lending a politically sensitive ear to the community, reporting to me or advising me on matters of political concern, or formulating or implementing plans for the future of the office or the direction in which we were headed." (*Id.*) Other affidavits specify the duties performed by the current deputy assessors. The current deputy assessors appear to be delegated a wide variety of tasks, ranging from the clerical, such as; filing, answering telephones, and shredding documents; to the discretionary, such as; "listing, measuring, reviewing, and updating residential and commercial properties for assessment." (*See* Carlile Aff. ¶ 3(a)-(i).) However, as made clear by the Sixth Circuit, in order to determine whether party affiliation is an appropriate requirement for employment, courts must not look to the duties of a position as performed by specific employees, but to the inherent duties of the position itself. *Faughender*, 927 F.2d at 913; *accord Rice*, 14 F.3d at 1140. Regardless of what duties various individuals in the position of deputy assessor have performed, or how the Plaintiffs themselves characterize these duties, the fact remains that under state law, deputy assessors are granted as much power as the assessor of property in valuating property for purposes of taxation. Moreover, although the affidavits submitted to the Court contain vague remarks about the "policymaking" involved in the assessor's office, the Plaintiffs have not come forth with any specifics regarding the degree or type of "policymaking" that is required of an assessor of property.[3] If they had, the Court might have concluded that the assessor's discretionary functions are not centered around the valuation of property. As it stands, however, the record is devoid of any evidence which would contradict the Court's conclu-

sion that the assessment of property is the primary responsibility of the property assessor, and as such, the fact that deputy assessors are given the same responsibility as the property assessor to perform valuations indicates that they are "policymaking" or "confidential" employees.

### 2. *Field Technician*

■ The position of field technician, unlike that of deputy assessor, is not specifically created by statute. However, Tennessee law does provide that "[t]he assessor shall employ such additional staff as the assessor deems necessary." Tenn.Code. Ann. § 67-1-506(b)(2). The duties of a field technician, as explained by Plaintiff Barbara Bandy, include: "identifying, listing, and measuring new construction; updating existing properties in Putnam County; processing data into [the] on-line computer system with the Division of Property Assessments in Nashville; [and] stamping deeds with the map/parcel numbers for registration for the 'deeds office.'" (Bandy Aff. ¶ 2.) The Defendants do not dispute that these are indeed the duties of a field technician, but allege that, given these duties, the position is political because, "by making investigations and processing data into an on-line computer system with the Division of Property Assessments ... [field technicians] had subjective input [in]to sensitive tax and budgetary decisions." (Reply to Mot. to Dismiss [Doc. No. 47] at 4.)

The Court cannot conclude that the position of field technician, as described above, is one for which political affiliation may be permissibly required. Although the field technicians do have access to sensitive information, it is clear that they are not delegated a substantial amount of policymaking authority, nor are confidential advisors, as defined by the Sixth Circuit in *McCloud*. 97 F.3d at

---

3. For example, former assessor of property Rippetoe alleges that "[a]lthough certain aspects of the plaintiffs' duties involved the exercise of judgment or discretion, none of their discretion was ever in relation to matters involving the management, direction, or policies of my office." (Rippetoe Aff. ¶ 6.) However, Rippetoe does not elaborate on what "management," "direction," or "policymaking" was required of him, besides that involved in the assessment of properties.

The Plaintiffs do cite such things as "matters affecting [assessor's] perception or popularity in the public eye" (*Id.* ¶ 7), and communicating with other elected officials (*Id.* ¶ 10), as matters which were policymaking in nature. However, the Court does not view public relations and communication with officials as policy concerns, nor are these matters incorporated by statute as primary duties of an assessor.

1557. As made clear in *Branti*, access to confidential information does not transform a position into a political one; rather, the confidential information must be of the type that would make political allegiance a permissible condition of employment. 445 U.S. at 518–19, 100 S.Ct. 1287. The field technicians do not partake in equalizing the assessment of property subject to taxation, Tenn.Code Ann. § 67–1–501, in advising the assessor of property in this task, or in controlling the assessor's lines of communication. Furthermore, the position of field technician does not fall into the remaining categories enumerated in *McCloud* as being political in nature, specifically, the position is not named by law as one to which discretionary authority has been granted, and the position is not one which must, for purposes of political balancing, be filled by a member of a specific political party.

## C. *Qualified Immunity*

■■■■ A public official is protected from liability in his individual capacity by the good faith qualified immunity defense when the official's conduct does not violate clearly established constitutional rights of which a reasonable public official knew, or should have known, at the time the alleged violation occurred. *See Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The standard for identifying "clearly established law" is whether public officials of reasonable competence could disagree regarding the requirements of the law. The Sixth Circuit recognizes that in order to conclude that a public official is not entitled to a good-faith qualified immunity defense, the court must determine that the right violated by the defendant is supported by clear precedent from the United States Supreme Court, the Sixth Circuit, or the District Court where the public official performs his or her official duties, or where he or she resides. *See Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1175 (6th Cir.1988). If clear precedent exists in courts other than those mentioned above, such precedent, in order to adequately notify a public official, "must point unmistakably to the unconstitutionality of the conduct

and be so clearly foreshadowed by applicable legal authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Id.* at 1177. With respect to the issue of political patronage, the Sixth Circuit has made clear that it is not necessary for courts to identify that a particular position is "political" in order to hold officials personally liable for their partisan employment actions. *Hall*, 128 F.3d at 429. However, for the purposes of qualified immunity, courts should resolve any ambiguity about the classification of a particular position in favor of the government defendants. *Id.*

■■■■ Aside from the general allegation that the Plaintiff's were dismissed upon Looper's taking office after the 1996 elections, none of the parties have supplied the Court with the exact dates of the Plaintiffs' terminations. Such information would have been particularly helpful to the Court because the seminal case in this circuit concerning political patronage, *McCloud*, was decided in 1996. Thus, the Court is unsure of whether *McCloud* was decided before the Plaintiffs were terminated, and consequently whether Looper should have been aware of this decision at the time. Nevertheless, the Court finds that even if *McCloud* was decided after Looper discharged the Plaintiffs, that given the state of the law at the time, Looper should have known that the position of field technician is not one for which political affiliation is an appropriate consideration.

Prior to *McCloud*, it was clearly established law that only "policymaking" and "confidential" employees could be discharged for political reasons. *See*, *McCloud*, 97 F.3d at 1553 (clarifying that even though *Branti* held that courts should look to the nature of a position, rather than to the labels "policymaking" or "confidential," that this nomenclature continued to be employed.). As has been discussed, it is clear from the description of the duties of a field technician that it is not a position which could be regarded as "confidential" or "policymaking." Accordingly, the Court finds that Looper is not shielded from individual liability on the basis of qualified immunity.

D. *Liability of the County and Liability of Looper in his Official Capacity*

In claims brought pursuant to 42 U.S.C. § 1983, a municipality can be held liable when it "unconstitutionally implements or executes a policy statement, ordinance, regulation, or decision officially adopted by that body's officers." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality need not have formally adopted a "custom" in order to be liable for it. *Id.* at 691, 98 S.Ct. 2018. An "official policy" includes: "formal rules or understandings—often but not always committed to writing—that are intended to, and do, established fixed plans of action to be followed under similar circumstances consistently over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Liability will only attach if "action pursuant to the policy" causes a constitutional tort. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. Furthermore, a direct causal link must exist between the municipality's actions and the alleged constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Such a causal connection can be established by showing that the governing body has delegated its decisionmaking authority to the individual whose illegal act caused the harm. *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir.1991) (quoting *Ware v. Unified Sch. Dist. No. 492*, 881 F.2d 906, 912–13 (10th Cir.1989)). However, a municipality cannot be held liable for merely employing a tortfeasor; the person implementing the policy must have the final decisionmaking authority to set policy in order to hold the municipal employer responsible for his or her actions. *Id.* at 481. The question of whether a person is a final decisionmaker is determined according to state law; "the identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge ... [and] it is for the jury to determine whether their decisions have caused the deprivation of rights." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

It is clear that under Tennessee law, the assessor of property has final decisionmaking authority to appoint personnel to assist him or her and to establish their salaries. Tenn.Code Ann. § 67–1–506(b)(2). While there is apparently no similar provision in the Tennessee Code regarding who has the authority to terminate personnel employed by the assessor, it would appear that from the language of Section 67–1–506 that since the assessor has the authority to appoint these individuals, he or she must also be authorized to make all employment decisions concerning them. This is confirmed by the apparent absence of a Tennessee statutory provision which grants any governing body the authority to review the assessor's employment decisions. Consequently, the Court concludes that the assessor is the individual with final decisionmaking authority regarding the employment of personnel in his office. As such, Putnam County is liable for Looper's act of firing Plaintiff Bandy if Putnam County is the entity which delegated its policymaking authority to the assessor of property. It is this very issue which is the subject of Putnam County's Motion for Summary Judgment.

Putnam County asserts that "Tennessee Assessors of Property are policymakers for the State of Tennessee and not [for] the various counties in which they hold office." (Mem. Supp. of Mot. Summ. J. at 2.) Accordingly, the County avers that if any constitutional violation occurred, it should be the State of Tennessee, and not Putnam County, which is liable. To support its claim, the County notes that the office of assessor of property is created by the Tennessee Constitution:

> The qualified voters of each county shall elect for terms of four years a legislative body, county executive, as Sheriff, a Trustee, a Register, a County Clerk, and an Assessor of Property. Their qualifications and duties shall be prescribed by the General Assembly. An officer removed shall be removed for malfeasance or neglect of duty as prescribed by the General Assembly.

Tenn. Const. art. VII, § 1 (1870). Furthermore, it points out that: (1) the assessor is

supervised by a state agency: the State Board of Equalization, Tenn.Code Ann. § 67–1–501; (2) his or her salary is set by the state, Tenn.Code Ann. § 67–1–508; (3) the assessor is authorized by state law to appoint his deputies and other staff, Tenn.Code Ann. § 67–1–506; and (4) the qualifications required for the position are set by state law, and specified by the State Board of Equalization, Tenn.Code Ann. § 67–1–509. Finally, the County points to the recent Supreme Court decision in *McMillian v. Monroe County*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). In *McMillian*, the office of sheriff was determined to be a state-controlled office. *Id.* at 1737–38. The County notes that many of the characteristics of the office of sheriff in that case are similar to those of the office of Assessor of Property in Tennessee.

The County's reliance on *McMillian*, however, is misplaced. While it is true that in *McMillian*, the sheriff was determined to be a policymaker for the state rather than the county, the Supreme Court came to this conclusion relying on Alabama *state* law. As emphasized by the *McMillian* Court, the question of whether an officer is a policymaker for any governmental entity must be determined by reference to state, not federal law. *Id.* at 1737. What *Alabama* law might have to say regarding its officers has no bearing on whether a *Tennessee* Assessor of Property receives his decisionmaking authority from the state or county government. *See Hamilton v. Stafford*, No. 1:96CV265–S–D, 1997 WL 786768, at *7 (N.D.Miss. Nov. 26, 1997) ("the holding in *McMillian* is quite narrow and limited to Alabama sheriffs").

More importantly, the supreme court of Tennessee has examined this question and has affirmed that all offices commissioned by Article VII, Section 1, of the state constitution, which includes the office of assessor of property, are county offices, and that accordingly, those officials work under the authority of the county. *See State ex rel. Winstead v. Moody*, 596 S.W.2d 811, 813 (Tenn.1980). Even if the supreme court of this state had not clearly ruled on this issue, in *Winstead*, the court emphasized the "the primary badge of a state officer is that the Legislature provide that the State pay the salary of the

office." *Id.* (quoting *Durham v. Dismukes*, 206 Tenn. 448, 333 S.W.2d 935, 938 (1960)). It would appear that the converse of this statement should also be true: the fact that the county pays the salary of an office would indicate that the office is a county office. Such is the case for the position of assessor of property. The Plaintiffs have submitted an unchallenged Affidavit from Bill Rippetoe which asserts that the salary of the Putnam County Assessor of Property is paid by the county with a check signed by the County Executive. (Rippetoe Aff. ¶ 2.)

In fact, the county exercises authority with respect to a multitude of functions of the assessor of property: the assessor is elected by voters of the county, Tenn.Code Ann. § 67–1–502; the county legislature fills any vacancies in this office, Tenn.Code Ann. § 67–1–503; the county legislature is required to perform certain functions regarding the posting of a bond before the assessor can take office, Tenn.Code Ann. § 67–1–505; the county executive administers the oath of office required for the position of assessor, Tenn.Code Ann. § 67–1–507; and the county may provide financial incentives in order to attract qualified assessors. Tenn.Code Ann. § 67–1–508. Given the above authority, the Court thus concludes that Putnam County is the government entity which has delegated its decisionmaking authority to the assessor of property, and consequently is liable for Looper's actions taken pursuant to this authority. Furthermore, since a suit against an officer is essentially a suit against a government entity, Plaintiff Bandy's claim against Looper in his official capacity must also be maintained. *Kentucky v. Graham*, 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

## III. CONCLUSION

In conclusion, the Court finds that the office of deputy assessor may be conditioned on political allegiance, and dismisses the claims against all Defendants by Plaintiffs Pharris, Roberts, Butler, and Huddleston. However, the Court concludes that Plaintiff Bandy, as field technician, was discharged in violation of her First Amendment rights as a

matter of law, and thus *sea sponte* grants summary judgment in favor of Plaintiff Bandy in her claims against all Defendants.